CLARK, Justice.
|, We granted this writ application in order to determine whether the courts below erred as to the allocation of fault, in awarding damages for fear of future injury, and in awarding punitive damages. For the reasons which follow, we affirm in part, reverse in part, and render judgment.
FACTS and PROCEDURAL HISTORY
On the night of June 18 and the morning of June 19, 2006, southwest Louisiana experienced a severe rainstorm. As a consequence of the storm, the stormwater drainage and storage system, including the wastewater treatment facility, at the Lake Charles, Louisiana, refinery of defendant, CITGO Petroleum Company (CITGO), was filled beyond available capacity and overflowed, resulting in a major oil spill. The system was designed to collect the water used in day-to-day operations at the refinery and the runoff from most areas of the refinery due to rainfall.
The system contained two 10 million gallon storage tanks with floating roofs, in which water was to be collected until it could be treated and released. The two tanks were equipped with “skimmers,” which were to remove any “slop oil”[1] from the wastewater. In addition, the tanks had fittings which would allow excess |2oil to be drained from the tanks into vacuum trucks. According to the CITGO standard operating procedure, the level of liquid in the tanks was to be maintained at five feet or less to maximize capacity. The tanks were enclosed in a concrete-floored area surrounded by concreted levees or “dikes.” This area was designed to contain any overflow from the tanks.
*311 Due to the ongoing construction of a third tank of similar capacity, a portion of the concrete dike system had been removed and the enclosed area was enlarged. The part of the dike surrounding the newly enclosed area was made of earth, as was its “floor.” Cementing of the floor and of the dike walls was not scheduled until after the third tank was completed. A pipeline ran under the newly enclosed area and a “junction box” was installed where the pipeline made a ninety degree turn. The junction box was made of cement and the cement cover was not sealed against leaks. The junction box was covered with unpacked earth. In addition, there were several pipes going through the dike wall.
Over 21 million gallons of waste, including 17 million gallons of contaminated wastewater and 4.2 million gallons of slop oil, escaped from the two existing waste-water storage tanks into an area around the tanks which was surrounded by levees or dikes. R. at 25,978. Of the 4.2 million gallons of slop oil which escaped, over 1 million gallons were released into the Cal-casieu River. R. at 25,979. The oil spill, which was described at trial as “major” and “catastrophic,” eventually contaminated over 100 miles of shoreline along the Calcasieu River, and required several months to clean up.
The fourteen plaintiffs, employees of Ron Williams Construction (RWC) working at the Calcasieu Refining Company (CRC) located 2.7 miles south of the CIT-GO refinery, filed suit against CITGO and R & R Construction, Inc. (R & R), in the Fourteenth Judicial District Court in Cal-casieu Parish, alleging various injuries due to their exposure to noxious gases emanating from the spill. CITGO and R & R | ^stipulated that they were liable for the spill and agreed to “pay plaintiffs for all their compensatory damages assessed to CITGO and R & R, if any, that plaintiffs are able to prove to the Court were proximately caused by such release from the CITGO refinery in Calcasieu Parish, Louisiana, on or about June 19, 2006.”
After a two week bench trial, the district court ruled that plaintiffs had proved their injuries, more likely than not, were caused by CITGO’s admitted negligence in allowing the spill. The court awarded plaintiffs general damages, including damages for fear of developing cancer in the future, ranging from $7000 to $15,000. Determining that Louisiana’s choice of law statutes favored the imposition of either Texas’ or Oklahoma’s punitive damages laws, the court further awarded each plaintiff $30,000 in punitive damages. The court of appeal affirmed, holding that the district court’s finding the spill caused plaintiffs’ injuries was not an abuse of discretion, the fear of future disease award was supported by the record, there was no evidence of fault on the part of either plaintiffs or their employer, the application of the punitive damages law of Texas was not error, and that, as required for recovery under Texas’ punitive damages law, CITGO was grossly negligent. Arabie v. CITGO Petroleum Corp., 10-244 (La.App. 3 Cir. 10/27/10), 49 So.3d 529. Defendants filed in this Court a Writ of Certiorari and/or Review, which was granted. Arabie v. CITGO Petroleum Corp., 2010-2605 (La.2/4/11), 56 So.3d 981.
DISCUSSION
CITGO asserts five assignments of error: (1) Louisiana law should apply to plaintiffs’ punitive damage claims, (2) the award of punitive damages violates CIT-GO’s due process rights under the United States Constitution, (3) the damage award changes the burden of proof in chemical exposure cases, (4) the lower courts failed to follow this Court’s jurisprudence in *312 awarding damages for fear of future injury, and (5) the lower courts did not allocate fault to all individuals responsible [4for plaintiffs’ alleged injuries.

Standard of Review

It is well-settled that a reviewing court may not disturb the factual findings of the trier of fact in the absence of manifest error. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1979). In Arceneaux, we set forth a two-part test for the appellate review of facts: (1) the appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court, and (2) the appellate court must further determine that the record establishes the finding is not clearly wrong or manifestly erroneous. Arceneaux, 365 So.2d at 1833; see also Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). If the trial court’s findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Consequently, when there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 883 (La.1993); Sistler, 558 So.2d at 1112.

Punitive Damages Claims

Our analysis of whether Louisiana law or another state’s laws should be applied with regard to punitive damages is controlled by Louisiana Civil Code Book IV, Conflict of Laws, Title VII, Delictual and Quasi-Delictual Obligations, Articles 3542 through 3548. The fundamental question in all cases involving statutory interpretation is legislative intent. City of DeQuincy v. Henry, 2010-0070 (La.3/15/11), 62 So.3d 43, 46. Further, according to the general rules of statutory interpretation, our interpretation of any statutory provision begins with the language of the statute itself. In re Succession of Faget, 10-0188, p. 8 (La.11/30/10), 53 So.3d 414, 420. While the Official Revision Comments are not the law, they may be helpful in determining legislative intent. See, e.g., State v. 5Jones, 351 So.2d 1194, 1195 (La.1977).
We recently reiterated many of the rules of statutory interpretation, stating:
When [a] provision is clear and unambiguous and its application does not lead to absurd consequences, its language must be given effect, and its provisions must be construed so as to give effect to the purpose indicated by a fair interpretation of the language used. Unequivocal provisions are not subject to judicial construction and should be applied by giving words their generally understood meaning.
Words and phrases must be read with their context and construed according to the common and approved usage of the language. “The word ‘shall’ is mandatory and the word ‘may’ is permissive.” Further, every word, sentence, or provision in a law is presumed to be intended to serve some useful purpose, that some effect is given to each such provision, and that no unnecessary words or provisions were employed. Consequently, courts are bound, if possible, to give effect to all parts of a statute and to construe no sentence, clause, or word as meaningless and surplusage if a construction giving force to and preserving all words can legitimately be found.
Where two statutes deal with the same subject matter, they should be harmonized if possible, as it is the duty of the courts, in the construction of statutes, to harmonize and reconcile laws. However, if there is a conflict, the stat *313 ute specifically directed to the matter at issue must prevail as an exception to the statute more general in character.
McGlothlin v. Christus St. Patrick Hospital, 2010-2775 (La.7/1/2011), 65 So.3d 1218, 1228-29 (citations omitted).
The trial court, in its reasons for judgment, began its analysis of whether another state’s punitive damages law should apply in this case by recognizing that punitive damages are not allowable unless expressly authorized by statute. The court then paraphrased Civil Code Article 3546, stating:
Punitive damages may not be awarded by Louisiana courts except when two of the following three are present:
(1) Punitive damages are authorized by the law of the state where the injurious conduct occurred
(2) Punitives are authorized by the law of the state where the injury occurred
(3) Punitives are authorized by the law of the place where the person Rwho caused the injury was domiciled
... [I]n determining in what state the injurious conduct occurred, it is necessary to determine whether the location of the corporate headquarters should be used, rather than the location of the local situs (in this case, refinery). In order for this to happen, the management or corporate level decisions and actions should “outweigh or equal the allegedly tortious conduct that occurred” locally. Similarly, an isolated corporate act will not outweigh “considerable business activities” conducted locally.
R. at 25,046 (citations omitted). As referenced, the trial court felt that the determining factor was the location of the injurious conduct. It found, without providing its analysis, that GITGO’s domicile was in Texas or Oklahoma. The court of appeal, in agreeing with the trial court’s ruling, did explore CITGO’s domiciliary location, holding that CITGO was domiciled in Texas for the purpose of Louisiana’s conflict of laws statutes. It is undisputed by the parties and the lower courts that the site of the injury is Louisiana.
CITGO argues that an analysis of Louisiana’s conflict of laws statutes indicates that the application of either Texas or Oklahoma punitive damages laws is erroneous. CITGO further argues that the lower courts erred in determining that CITGO was not a domiciliary of Louisiana and that the place of injurious conduct was in Texas or Oklahoma. Plaintiffs, as may be expected, argue in opposition that the lower courts were correct in making these two determinations.
According to the Civil Code, punitive damages may only be awarded under certain conditions. We begin our analysis by examining Article 3546 of the Code, entitled “Punitive damages,” which reads:
Punitive damages may not be awarded by a court of this state unless authorized:
(1) By the law of the state where the injurious conduct occurred and by either the law of the state where the resulting injury occurred or the law of the place where the person whose conduct caused the injury was domiciled; or
(2) By the law of the state in which the injury occurred and by the law of the state where the person whose conduct caused the injury |7was domiciled.
C.C. art. 3546.
Subparagraph (2) of the article requires that punitive damages be authorized by both the state in which injury occurred and the state of domicile of the person who caused the injury. Because it is undisputed that all the injuries occurred in Louisiana, subparagraph (2) clearly does not apply.
*314 Likewise, the first instance described in subparagraph (1) of the article is not applicable, as both the injurious conduct and the resulting injuries are required to have occurred in a state which authorizes punitive damages. As pointed out above, the injuries, at least, occurred in Louisiana.
Under the second instance described in subparagraph (1), both CITGO’s domicile and the place of injurious conduct must have been in Texas or Oklahoma for the Texas or Oklahoma punitive damages laws to apply, as found by the trial court.
As pertains to conflict of laws questions, a party’s domicile shall be determined according to Articles 3518 and 3548 of the Civil Code.
Article 3518 reads:
For the purposes of this Book [Book IV, Conflict of Laws], the domicile of a person is determined in accordance with the law of this state. A juridical person may be treated as a domiciliary of either the state of its formation or the state of its principal place of business, whichever is most pertinent to the particular issue.
C.C. art. 3518.
Article 3548, in turn, reads:
For the purposes of this Title [Title VII, Delictual and Quasi-Delictual Obligations], and provided it is appropriate under the principles of Article 3542, a juridical person that is domiciled outside this state, but which transacts business in this state and incurs a delictual or quasi-delictual obligation arising from activity within this state, shall be treated as a domiciliary of this state.
C.C. art. 3548. As stated above, when two statutes apply to the same subject |smatter and their language cannot be harmonized, the language of the more specific statute applies, which, in this case involving delic-tual obligations, would be Article 3548. Here, though, the two statutes can be harmonized.
CITGO is a Delaware corporation with its corporate headquarters located in Houston, Texas. As such, it is a juridical person domiciled outside this state per Article 3518. CITGO also operates its refinery in Lake Charles, Louisiana, the place at which the oil spill occurred. Under Article 3548, juridical persons domiciled outside Louisiana, as is CITGO under Article 3518, who incur a delictual obligation, shall be treated as a domiciliary of Louisiana if appropriate under the principles contained in Article 3542. Thus, under Article 3548, CITGO must be treated as a domiciliary of Louisiana if such treatment is appropriate under the principles of Article 3542, and, if so, the second instance described in Article 3546, subparagraph (1) is inapplicable. The court of appeal recognized the interplay between Articles 3548 and 3542, but in its analysis of CITGO’s domicile, listed only those facts which would tend to support the trial court’s ruling on domicile, but neglected to address the facts which would support a finding that CITGO should be considered a domiciliary of Louisiana.
We turn, then, to the analysis of Article 3542 to determine, under the principles set out therein, whether it would be appropriate to consider CITGO a Louisiana domiciliary under Article 3548.
Article 3542 states:
Except as otherwise provided in this Title, an issue of delictual or quasi-delic-tual obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the events *315 giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the parties was Reentered; and (2) the policies referred to in Article 3515, as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.
G.C. art. 3542.
We recently examined the interplay of factors contained in Article 3542 in our opinion in Wooley v. Lucksinger, 09-571 (La.4/1/11), 61 So.3d 507, 567. In that case, the Louisiana Commissioner of Insurance filed tort and contract suits against several defendants on behalf of a failing health maintenance organization (HMO). The Oklahoma Commissioner of Insurance and a receiver appointed by the Texas Commissioner of Insurance intervened as plaintiffs in the tort cases on behalf of affiliated HMOs, organized and doing business in those states, which had similar tort causes of action against the defendants. The three lawsuits — which alleged causes of action in negligence, negligent misrepresentation, conspiracy, fraud, breach of fiduciary duty, unfair or deceptive acts or practices, and contractual liability — were consolidated. The scheme that formed the core of the matter was relatively simple: after regulatory approval for the sale of the HMOs was obtained in all three states, the parties drafted a final sale document which re-characterized the HMOs’ premium deficiency reserves, the amount an insurance company is required to keep on hand to cover claims which cost more money than has been received in premiums, as a restructuring reserve. This sole action had the effect of increasing the assets of the HMOs as of the day before the sale, which allowed the parent corporation — under the expressly-approved sale terms — to take out more of the assets of the HMOs than regulators believed would happen in the transaction. Thus stripped of their reserves, the HMOs were left in a financially unsustainable position from which they never recovered. The trial court determined that Texas law applied to the tort cases.
During our review of that decision under the factors contained in Article 3542, we noted that two of the defendants in the case were domiciled in Texas, |Tnwhile the other two were domiciled in Oklahoma and Louisiana, respectively. We determined that the majority of the tortious conduct occurred in Texas, and we noted that the tortious conduct which occurred in Texas had consequences and caused injury in Louisiana, Oklahoma, and Texas, but the most severe harm, in terms of the number of injuries and dollar amounts of damage occurred in Texas. Under those facts, we determined that the trial court did not err in finding that Texas had the most significant contacts under Article 3542.
As stated in its first paragraph, the objective of the article is to identify the state whose policies would be most seriously impaired if its law were not applied. To accomplish this, the statute lists several nonexclusive factors to be considered in determining choice of law questions: (1) The pertinent contacts of each state to the parties; (2) their contacts to the events giving rise to the dispute, including the place of conduct and injury; (3) the domicile, habitual residence, or place of business of the parties; (4) the state in which the relationship between the parties was centered; (5) deterring wrongful conduct; and (6) repairing the consequences of injurious acts. The article also imports from Article 3515 the following factors: (7) the relationship of each state to the parties and the dispute; and (8) the policies and needs of the interstate system, including *316 the policies of upholding the justified expectations of the parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state. As stated in the comments to the article:
[T]his article provides an illustrative list of the most important factual contacts in light of which to evaluate the strength and pertinence of the above policies. These contacts will serve the dual role of helping, first, to identify the potentially concerned states, and, then, to assess the pertinence and strength of their respective policies and the impacts of the decision on such policies. The listing of contacts is neither exhaustive nor hierarchical, and is intended to discourage a mechanistic counting of contacts as a means of selecting the applicable law ... [T]he evaluation of factual contacts should be qualitative rather than quantitative, and should be made in the light of the policies of each contact-state that are pertinent to the particular | nissue in dispute.
C.C. art. 3542, Revision Comment (a).
In his reasons for judgment, the trial judge began his discussion of choice of law with regard to punitive damages with an analysis of Article 3542. The court did not discuss each state’s contacts in the terms laid out by the statute. Although, the factors listed in Article 3542 are merely “illustrative,” the factors are also “the most important factual contacts” to which a court should turn in determining choice of law questions.
Here, in its reasons for judgment, the court found:
(1) that a serious spill occurred in Louisiana; (2) that the defendant’s home office was located in Texas at the time of the spill; (3) that significant funding, steerage, and budget decisions leading to the under building of the wastewater treatment facility, and ultimately the spill, were made at corporate headquarters in Texas and Oklahoma in furtherance of profit enhancement; (4) this Court’s previous ruling that the defendant engaged in civil fraud prior and subsequent to the spill; (5) the defendant failed to adequately warn the local populace of their existing Material Safety Data Sheet (MSDS) for the spilled product; and (6) the defendant cogni-zantly misinformed government agencies of the status and capabilities of their Waste Water Treatment Unit.
R. at 25,048. We recently looked at a trial court’s failure to expressly analyze each factor contained in a statute, in terms of child relocation, in the case of Gathen v. Gathen, 10-2312 (La.5/10/11), 66 So.3d 1. In that case, we held that a trial court is not required to expressly analyze each statutorily listed factor in its oral or written reasons, and the court’s failure to do so does not constitute an error of law which would allow de novo review. Gathen, 66 So.3d at 13. We went on to look at the reasons and factors the trial court did expressly take into account in reaching its ultimate determination, and we examined the factors the trial court did not expressly discuss to determine whether the trial court’s failure to give weight to these factors led the court to err in reaching its determination. Gathen, 66 So.3d at 13. Here, we will do the same.
112With regard to each state’s pertinent contacts with the parties, the trial court mentioned that CITGO’s corporate offices were in Texas at the time of the spill. The court did not discuss the fact that CITGO operated one of the largest refineries in Louisiana, covering 500 acres and employing 900 CITGO personnel and 500 to 900 contractors, or that all of the plaintiffs resided and were employed in Louisiana. There is no evidence that either Texas or *317 Oklahoma had any contacts with the plaintiffs. Texas, then, had contact only with CITGO, while Louisiana had contacts with all parties. This factor favors the imposition of Louisiana law.
With regard to the second factor, the states’ contacts to the events giving rise to the dispute, including the place of conduct and injury, the trial court found that “significant funding, steerage, and budget decisions leading to the underbuild-ing of the wastewater treatment facility, and ultimately the spill, were made at corporate headquarters in Texas and Oklahoma in furtherance of profit enhancement.” R. at 25,048. This finding is belied by the undisputed facts. In making the finding, the court cited to In Re Train Derailment, 2004 WL 169805 (E.D.La.) for the idea that “management or corporate level decisions and actions [must] ‘outweigh or equal the allegedly tortious conduct that occurred’ locally.” Further, the trial court referenced Security Title Guarantee Corp. of Baltimore v. United General Title Ins. Co., 91 F.3d 137 (5th Cir.1996), in saying that an isolated corporate act will not outweigh “considerable business activities” conducted locally. Although the cited cases are merely persuasive, rather than precedential, we agree, more or less, with these propositions, though we find the latter more accurate than the former, based on our legislature’s decision to disallow punitive damages except in specific situations. In light of the State’s general policy against punitive damages, we hold that, in determining the location where injurious conduct occurred, management or corporate level decisions must outweigh tortious activity which occurs locally in order for the location of the corporate or management decision to be considered the |1slocale of the injurious conduct.
The underbuilding of the wastewater treatment facility found by the lower courts consisted primarily of CITGO’s delaying the construction of a third 10 million gallon storage tank as part of the unit. The courts, though, ignored the physical impossibility of containing the spill within the planned third tank. As stated earlier, the planned third tank, like the two existing tanks, was designed to hold 10 million gallons of wastewater. R. at 25,971. However, over 21 million gallons of waste, including 17 million gallons of contaminated wastewater and 4.2 million gallons of slop oil overflowed from the two existing tanks. R. at 25,978. The spill occurred after the tanks overflowed from the top. The slop oil was the first substance to escape from the tanks, as oil floats on top of water. R. at 26,105-26,106. This 21 million gallons of waste obviously could not have been contained in a 10 million gallon tank, even had it been built. The trial court also found that CITGO, in Louisiana, failed to adequately warn the local populace of their existing Material Safety Data Sheet for the spilled product.
Other factors not mentioned by the trial court, but which also had a great impact in causing the spill were:
(1) the oil escaped from the containment area through a junction box under the earthen floor of the diked area to an area which was not contained within the dikes, R. at 26,125-26,128;
(2) the lid of the junction box was improperly sealed, and the earth covering the junction box was improperly packed, R. at 26,127-26,128;
(3) the seepage of oil through the earthen portion of the dike surrounding the wastewater treatment facility, R. at 26,-112;
(4) the escape of oil through an 18 inch pipe which went through the dike wall, R. at 29,914;
*318 (5) the disrepair of the oil skimmers which were to have removed waste oil from the water for treatment, resulting in slop oil floating on top of the storm-water, R. at 26,189;
(6) leaking at the seals of several pipes extending through the dikes, 114R. at 26,-110;
(7) the failure to close valves allowing excess water from the intermediate tank farm to drain into the stormwater system, R. at 26,141;
(8) the temporary taking out of service of several dikes, which allowed excess water to enter the stormwater system, R. at 26,141-26,142; and
(9) the failure to maintain a liquid level of 5.5 feet or less in the existing tanks, R at 26,137.
Plaintiffs’ expert testified that the disrepair of the oil skimmers, the substandard dikes, and the failure to keep the liquid in the tanks at a level of 5.5 feet, the nonfunctional emergency side draws and substandard preventive maintenance prevented the existing wastewater system from having the capacity to handle a twenty-five year rain event. R. at 26,304. All of these latter problems occurred in and could have been corrected in Louisiana. Further, all of plaintiffs’ injuries occurred in Louisiana. Because the overflow likely would have occurred whether or not the third tank had been built, CITGO’s decision to delay the tank’s construction did not outweigh the allegedly tortious conduct that occurred locally. This factor, likewise, favors the imposition of Louisiana law.[2]
With regard to the third factor, the domicile, habitual residence, or place of business of the parties, CITGO is incorporated in Delaware with its principal place of business first in Tulsa, Oklahoma, and then in Houston, Texas. CITGO operated a large refinery in Louisiana, employing 1,400 to 1,800 workers. The plaintiffs were all residents of Louisiana and were employed in Louisiana. Again, this factor favors the imposition of Louisiana law.
The state in which the relationship between the parties was centered, the fourth factor, was Louisiana. The only contact between the parties was the spill, |15which occurred in Louisiana and caused plaintiffs’ injuries in Louisiana. This factor heavily favors the imposition of Louisiana law.
The fifth factor, deterring wrongful conduct, appears to favor the imposition of punitive damages, the purpose of which is to punish wrongful conduct. The strength of this factor, however, is diminished by Louisiana’s policy disfavoring punitive damages in general.[3] As a result, this factor is neutral.
The imposition of punitive damages, however, has no bearing on the sixth factor, that of repairing the consequences of injurious acts. The plaintiffs have been made whole through the award of compensatory damages, which was done here under Louisiana law. This factor, likewise, is neutral.
Some of the facts contained in the seventh factor, the relationship of each state to the parties and the dispute, have been *319 discussed above. The sole relationship between Texas or Oklahoma and the parties is that CITGO’s corporate headquarters was first in Tulsa and then Houston, and the decision to delay building a third stormwater tank was made at corporate headquarters in Houston. Louisiana’s relationship with the parties includes CIT-GO’s operation of the refinery in Louisiana, CITGO’s employment of 1,400 to 1,800 Louisiana residents at the refinery in question, the Louisiana Department of Environmental Quality’s regulation of the refinery in question, and the residence and place of employment of the plaintiffs. The dispute centers on a major oil spill which occurred only in Louisiana, and which caused damage and injuries only in Louisiana. The suit was filed in Louisiana. Again, this factor favors the imposition of Louisiana law.
The final factor takes account of the policies and needs of the interstate system, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party 11fito the law of more than one state. Here, it is unlikely that CITGO anticipated that ordinary budget decisions made at corporate headquarters would result in the imposition of Texas law for an oil spill which occurred in Louisiana, damaged property only in Louisiana, and injured only Louisiana residents. Likewise, CITGO could have likely anticipated that an oil spill in Louisiana caused by actions and failures to act in Louisiana, which resulted in injuries and damage only to Louisiana residents and Louisiana property would be controlled by Louisiana law. Finally, neither Texas nor Oklahoma has an overriding interest in applying their laws to the decisions of their corporate domieiliaries, when those decisions have no effect in those states, and when those decisions are not the primary cause of injury in another state.
Based on the above, it is appropriate under the principles of Article 3542 for CITGO to be considered a domiciliary of Louisiana under Article 3548. Because both CITGO’s domicile and the place of injurious conduct must have been in Texas or Oklahoma for either of those state’s punitive damage laws to apply under the second instance described in subparagraph (1) of Article 3546, CITGO is not liable for punitive damages under that Article. In finding to the contrary, the trial court erred. In reaching this conclusion, we in no way criticize our finding in Wooley, the result in which was based upon the facts contained in that case.
Next, we turn to Civil Code Article 3543, which plaintiffs argue, and the court of appeal found, also applies in this matter and results in the imposition of another state’s punitive damages laws. We disagree with both plaintiffs and the court of appeal. Article 3543 reads:
Art. 3543. Issues of conduct and safety
Issues pertaining to standards of conduct and safety are governed by the law of the state in which the conduct that caused the injury occurred, if the injury occurred in that state or in another state | l7whose law did not provide for a higher standard of conduct.
In all other eases, those issues are governed by the law of the state in which the injury occurred, provided that the person whose conduct caused the injury should have foreseen its occurrence in that state.
The preceding paragraph does not apply to cases in which the conduct that caused the injury occurred in this state and was caused by a person who was domiciled in, or had another significant *320 connection with, this state. These cases are governed by the law of this state.
C.C. art. 3543.
First, as we stated above, when two statutes apply to the same subject matter and their language cannot be harmonized, the language of the more specific statute applies. McGlothlin, 65 So.3d at 1229. Here, when determining whether another state’s punitive damages laws should apply, Article 3546, “Punitive damages,” is more specific to the issue than is Article 3543, “Issues of conduct and safety.”
However, even if Article 3546 were to apply, the first paragraph of the Article provides that issues pertaining to standards of conduct are governed by the law of the state in which the injurious conduct occurred. As we previously discussed, the most significant conduct occurred in Louisiana. In either case, Article 3543 does not authorize the imposition of punitive damages in this case.
Finally, the trial court found “additionally and alternatively” that Civil Code Article 3547, the escape clause, applies in this case and “permits the application of Texas and Oklahoma law regarding punitive damages.” R. at 25,048. Article 3547 reads:
Art. 3547. Exceptional cases
The law applicable under Articles 3543-3546 shall not apply if, from the totality of the circumstances of an exceptional case, it is clearly evident under the principles of Article 3542, that the policies of another state would be more seriously impaired if its law were not applied to the particular issue. In such event, the law of the other state shall apply.
C.C. art.-3547.
[ 18As our previous analysis of the factors contained in Article 3542 shows, it is not “clearly evident” that the policies of Texas or Oklahoma would be more seriously impaired if the law of either of those states were not applied to this issue.
The dissent states that “the primary question presented by article 3542 is which state’s policies would be ‘most seriously impaired if its laws were not applied to the issue.’ ” The dissent fails to consider, though, for the most part, the factors listed in Article 3542, which comment (a) to the Article calls “the most important factual contacts in light of which to evaluate the strength and pertinence of the ... policies,” in reaching its contrary position, while the majority has applied each and every factor.
Because plaintiffs are not authorized to recover an punitive damages under Articles 3546 or 3543, and because this matter does not qualify as an exceptional case under Article 3547 through the application of the factors contained in Articles 3542 and 3515, we find that the punitive damages laws of Texas and Oklahoma are not authorized under Louisiana’s conflict of laws statutes, and the rulings of the courts below to the contrary were in error.

Due Process Rights

In its second assignment of error, CIT-GO argues that the trial court’s award of punitive damages to plaintiffs violates CITGO’s due process rights under the United States Constitution. Because we have determined that CITGO is not subject to the imposition of punitive damages, this issue is moot.

Burden of Proof

In the third assignment of error, CITGO claims that the trial court’s award of damages to plaintiffs, and the appellate court’s affirmation of the same, changes the burden of proof in chemical exposure cases.
*321 CITGO argues that plaintiffs were required to prove causation by means of scientific evidence showing exposure levels sufficient to cause the injuries alleged, |19that none of the available air monitoring data points revealed exposure levels above government health-protective standards, and that plaintiffs only presented evidence that their symptoms were consistent with symptoms which could result from overexposure to certain chemicals in the oil. Plaintiffs counter with the argument that, even though an opinion on exposure can be based upon circumstantial evidence or a patient’s statements or subjective symptoms, plaintiffs in this case offered far more than circumstantial evidence of exposure or plaintiffs’ testimony.
The test for determining the causal relationship between the tortious conduct and subsequent injuries is whether the plaintiff proved through medical testimony that it was more probable than not that subsequent injuries were caused by the accident. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993).
Here, the spill caused the refinery at which the plaintiffs worked to be surrounded by slop oil. This slop oil, according to CITGO’s MSDS, contained various levels of hydrogen sulfide, benzene, xylene, toluene, n-Hexane, ethylbenzene, heptanes, octane, nonane, and trimethylbenzene, and inhalation of its vapors can cause symptoms ranging from nausea, headache, dizziness, fatigue, drowsiness, and unconsciousness to organ damage, cancer, and death. R. at 3178-3179.
Plaintiffs all testified that they experienced contemporaneous or near-contemporaneous symptoms of eye irritation, nausea, nasal and throat irritation, and difficulty in breathing when exposed to the odors and fumes from the slop oil spill. Plaintiffs presented evidence from experts in toxicology, air dispersion modeling, environmental chemistry, exposure monitoring, odor, industrial hygiene, epidemiology, and occupational and environmental medicine. These experts agreed that plaintiffs’ reported symptoms were consistent with exposure to toxic chemicals contained in the slop oil.
| ¡^Plaintiffs’ air modeling expert, Dr. Paul Rosenfeld, testified that his models showed that plaintiffs were exposed to levels of benzene, hydrogen sulfide, and sulfur dioxide above regulatory limits, that their exposure took place over a period of weeks, and that just the noxious odor of the slop oil could cause some of plaintiffs’ symptoms.
Plaintiffs’ industrial hygiene expert, Frank Parker, testified that slop oil contains chemicals which are both an immediate and a delayed health hazard. He further testified that breathing the vapors can cause nausea, headache, dizziness, fatigue, drowsiness, unconsciousness, and death. He also testified that if a person smells slop oil, they have been exposed.
Dr. Barry Levy, plaintiffs’ expert in epidemiology and occupational and environmental medicine, testified that the symptoms of each individual plaintiff were related to the oil spill to a reasonable medical probability, although he admitted that some of the plaintiffs’ symptoms were not related. He testified that he did not know the quantitative level of exposure for any of the chemicals contained in the slop oil, but, based on the fact that the odor was present for an extended period, he had qualitative information which led him to believe that the plaintiffs were exposed to a substantial amount of the constituents of the slop oil.
Finally, plaintiffs’ medical records indicated that their treating physicians were of the opinion that their symptoms were con *322 sistent with exposure to the toxic chemicals contained in the slop oil.
As stated previously, CITGO argues that in order to prove causation, plaintiffs were required to prove exposure by means of scientific evidence such as air monitoring data. We find instructive our holding in the case of Edwards v. Sawyer Industrial Plastics, Inc., 99-2676 (La.6/30/00), 765 So.2d 328. That worker’s compensation matter involved a plaintiff who had been exposed to styrene fumes in the workplace over a period of about eighteen months. The | ⅞1 plaintiff introduced both lay and expert testimony, including that of fellow workers who testified as to their symptoms while in the workplace, and that of an expert in internal, occupational, environmental and forensic medicine, who testified that the plaintiffs symptoms were consistent with exposure to toxic chemicals. The worker’s compensation judge found that the plaintiff suffered from an occupational disease and was permanently and totally disabled. The court of appeal reversed, holding that the plaintiff had failed to meet his burden of establishing that his disabling condition was caused by exposure to toxic chemicals on the job. This Court, in turn, reinstated the worker’s compensation judge’s decision, on the basis of the lay and expert testimony, and in spite of the absence of “scientific evidence” as to the level of exposui'e. Here, as in Edwards, there is substantial evidence supporting the trial court’s determination that plaintiffs’ injuries were caused by exposure to toxic chemicals contained in the slop oil, even though that determination is not supported by air monitoring data.

Fear of Future Injury

In its fourth assignment of error, CITGO argues that the lower courts failed to follow this Court’s jurisprudence in awarding damages for fear of future injury, citing this Court’s opinion in Bonnette v. Conoco, Inc., 01-2767 (La.1/28/03), 837 So.2d 1219, for the proposition that fear of future injury must be supported by a showing that the alleged fear is more than speculative or merely possible. CITGO claims that there is no such evidence. Plaintiffs argue, on the other hand, that Bonnette is inapposite to the present matter, as it dealt with damages for mental anguish in the absence of physical injury, which are present here.
In Bonnette, the plaintiffs were exposed to a de minimis amount of asbestos, a known cancer-causing substance. This court reversed the lower courts’ rulings that the plaintiffs were entitled to damages for the fear of developing asbestos related cancer, citing the holding in Moresi v. State, Dept. of Wildlife & Fisheries, 22567 So.2d 1081 (La.1990). That case held that a defendant will not be held liable where his conduct is merely negligent and causes only emotional injury unaccompanied by physical injury. Bonnette, 837 So.2d at 1234, 2001-2767 La. 23-24. The Bonnette court, distinguished its holding from that in Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974), recognizing that fear of contracting cancer, when accompanied by physical injury, as has occurred in the instant matter, is compen-sable.
Here, each plaintiff testified to a fear of contracting cancer in the future as a result of his exposure to the toxic chemicals contained in the slop oil for a period of weeks. As we said in Anderson, “While to a scientist in his ivory tower the possibility of cancerous growth may be so minimal as to be untroubling, we are not prepared to hold that the trier of fact erred in finding compensable this real possibility to th[ese] worrying workmen.” Anderson, 304 So.2d at 353. We find that the lower courts did *323 not err in awarding plaintiffs damages for fear of future injury.

Fault Allocation

Finally, CITGO argues that the lower courts did not allocate fault to all individuals responsible for plaintiffs’ alleged injuries. This issue was decided on plaintiffs’ motion for summary judgment at the trial court in favor of plaintiffs.
This court recently discussed the method of review of motions for summary judgment as follows:
A summary judgment is reviewed on appeal de novo, with the appellate court using the same criteria that govern the trial court’s determination of whether summary judgment is appropriate; i.e. whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law.
[[Image here]]
A motion for summary judgment will be granted “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” La. C.C.P. art. 966(B). This article was amended in 1996 to | ^provide that “summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action ... The procedure is favored and shall be construed to accomplish these ends.” La. C.C.P. art. 966(A)(2). In 1997, the legislature enacted La. C.C.P. art. 966 C(2), which further clarified the burden of proof in summary judgment proceedings, providing:
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
Samaha v. Rau, 2007-1726 (La.2/26/08), 977 So.2d 880, 888-4.
Here, the burden of proof at trial to show comparative fault would have been on CITGO. In support of their motion, and in addition to pointing out that CITGO had no evidence to show that third parties or plaintiffs were at fault, plaintiffs attached to their motion deposition testimony from William Hatch, CITGO’s chief of operations, who testified that oil skimmers in the wastewater tanks were not operational, that the water and oil level in the tanks was at seventeen feet rather than the required five and one half feet, and that both of those problems violated CIT-GO policy and were preventable. Plaintiffs also attached the deposition testimony of Matteson Bell, a cleanup operator, who stated that the oil spill went south to CRC and that he did not install booms there until the second day of the spill. The deposition testimony of David Hollis, CIT-GO’s environmental manager, was also attached. He also testified that the oil spill moved south toward CRC.
In its answers to interrogatories on file, CITGO responded to Interrogatory No. 7, which inquired as to parties or non-parties that CITGO contended were at fault, by declaring that it was investigating whether there was fault on the part of | ^R & R *324 Construction for faulty design or construction of the concrete junction box and for disturbing its clay barrier cap, and that it was investigating whether there was any fault on the parts of Marine Spill Response Corp., National Response Corp., and Global Pollution Services for their response efforts. In its response to Interrogatory No. 9, inquiring as to plaintiffs’ fault, CIT-GO replied that it was investigating the use of protective equipment by certain plaintiffs responding to the spill.
This evidence sufficed to make a prima facie case that CITGO alone was at fault in causing the spill and, in turn, plaintiffs’ injuries. The burden then shifted to CITGO to prove that it could produce evidence to show plaintiffs’ or third party fault at trial.
In its opposition to plaintiffs’ motion for summary judgment, CITGO attached to its memorandum in opposition the policy statement contained in CRC’s company safety manual. The policy statement declared that CRC would establish safety and health programs, provide necessary equipment, clothing, and services required for the protection of employees, control hazards to employees, require the use of safety devices, protective equipment, and clothing, and provide a safe and healthful environment for its employees.
CITGO also attached a form from Ron Williams Construction, plaintiffs’ employer, entitled Supervision Safety Requirements, which related that supervisors were to provide a safe work environment for employees.
CITGO also attached portions of the depositions of two of the plaintiffs, in which they described the smell of the spill and their immediate reaction to the odor. Dexter Breaux also testified that CITGO never told him that there was a chemical exposure. Bennett Talbot testified that the plaintiffs did not think there was any special danger from the spill.
CITGO did not carry its burden of proving at the hearing on the motion for | ^summary judgment that it would be able to show plaintiffs’ or third party fault at trial. The trial court, therefore, did not err in granting plaintiffs’ motion for summary judgment as to third party fault.
CONCLUSION
In sum, we hold that Louisiana’s conflict of laws statutes do not provide for the application of the punitive damages laws of Texas or Oklahoma under the facts of this case, that plaintiffs proved that their damages were caused by their exposure to toxic chemicals contained in the oil spill, that plaintiffs are entitled to damages for fear of contracting cancer, and that CIT-GO did not produce at the hearing on summary judgment factual support sufficient to establish that it would be able to satisfy its evidentiary burden of proof at trial.
DECREE
For the foregoing reasons, we reverse the rulings of the courts below in part, affirm in part, and render judgment.
JOHNSON, Justice, concurs in part and dissents in part for the reasons assigned by KNOLL, J.
KNOLL, Justice, concurs in part and dissents in part with reasons.
GUIDRY, Justice, concurs in the result and assigns reasons.

. "Slop oil” is the generic term for a mixture of oil, chemicals and water derived from various locations in an oil refinery.

. We realize that, having determined that the "injurious conduct” occurred in Louisiana, we have likewise found that Article 3546 does not provide for the imposition of punitive damages. For the purposes of determining CITGO’s domicile only, we will assume that the injurious conduct occurred in Texas.

. As we have previously discussed, the legislature has seen fit to authorize punitive damages only in certain specific instances. The fact that punitive damages are only authorized in particular situations shows that the State has a general policy against punitive damages.