STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

18-906


JOSHUA L. ADAMS, ET AL.

VERSUS

UNION PACIFIC RAILROAD COMPANY, ET AL.


**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 14-C-3165-B
HONORABLE A. GERARD CASWELL, DISTRICT JUDGE

**********

**CANDYCE G. PERRET**
**JUDGE**

**********

Court composed of D. Kent Savoie, Candyce G. Perret, and Jonathan W. Perry, Judges.


**REVERSED.**

Kenneth Warren DeJean
Attorney at Law
Post Office Box 4235
Lafayette, LA 70502
(337) 235-5294
SPECIAL MASTER

William H. Howard, III
Alissa A. Allison
Kathlyn G. Perez
Laura E. Carlisle
Baker, Donelson, Bearman, Caldwell,
& Berkowitz, P.C.
201 St. Charles Avenue, Suite 3600
New Orleans, LA 70170
(504) 566-5200
COUNSEL FOR DEFENDANT/APPELLANT:
      Union Pacific Railroad Company

H. Alston Johnson, III
Steven J. Levine
Paul LeBlanc
John B. Shortess
Phelps Dunbar, LLP
Post Office Box 4412
Baton Rouge, LA 70821-4412
(225) 346-0285
COUNSEL FOR DEFENDANT/APPELLANT:
      Union Pacific Railroad Company

Antonio M. Clayton
Clayton, Frugé & Ward
3741 Highway 1 South
Port Allen, LA 70767
(225) 344-7000
COUNSEL FOR DEFENDANT/APPELLANT:
      Union Pacific Railroad Company

Elena A. Pecoraro
Grant F. Freeman
Anna M. Grand
Pecoraro Law Firm
95 Woods Crossing, Suite 100
Lafayette, LA 70508
(337) 266-2233
COUNSEL FOR DEFENDANT/APPELLANT:
      Union Pacific Railroad Company

**D. Blayne Honeycutt**
**Colt J. Fore**
**Hannah Honeycutt Calandro**
**Fayard & Honeycutt**
**519 Florida Avenue, SW**
**Denham Springs, LA 70726**
**(225) 664-0304**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
**Sheryl Bobb, individually and on behalf of Alyiah Bobb**

**PERRET, Judge.**

This case is one of several stemming from a train derailment in Lawtell, Louisiana ("Lawtell Derailment") and those injuries suffered by members of the surrounding community. Defendant-Appellant Union Pacific Railroad Company ("Union Pacific") appeals the trial court judgment that awarded Plaintiffs, Sheryl Bobb, individually and on behalf of Alyiah Bobb, damages in the amount of $200.00. For the following reasons, we reverse.

**FACTUAL AND PROCEDURAL BACKGROUND:**

On August 4, 2013, a train derailed near Lawtell, Louisiana. Twenty-six railcars[1] derailed, causing lube oil, dodecanol, and sodium hydroxide solution (also referred to as sulfidic caustic solution), to spill from three of the derailed train cars onto the land and into a nearby drainage ditch. The other derailed cars also contained chemical substances, including vinyl chloride. The derailment prompted a one-mile radius evacuation zone that remained in effect until August 7, 2013. Many of those evacuated were directed to Evangeline Downs and were housed there at the hotel for several days.

Multiple residents, including Plaintiffs, filed suit on July 11, 2014, against Union Pacific. In the April 1, 2016 case management order, all cases pending in the Louisiana Twenty-Seventh Judicial District Court related to the Lawtell Derailment were consolidated into one division for the purpose of determining liability. Union Pacific stipulated to liability on September 12, 2016, but reserved its causation and damages defenses.

---

[1] Union Pacific's brief refers to only twenty-three train cars derailing. However, the evidence suggests that an updated report from Union Pacific indicated that twenty-six train cars derailed.

On February 8, 2017, the trial court appointed Kenneth DeJean as Special Master to preside over the causation/damages trials of the pending claims pursuant to La.R.S. 13:4165.[2] The cases were not consolidated and, therefore, each plaintiff's case was tried separately and resulted in separate judgments.

Union Pacific presented its case on June 27-28, 2017, which testimony and evidence was carried forward pursuant to a stipulation of all counsel. Ms. Bobb presented her case-in-chief on August 14, 2017. The Special Master issued his report and recommendation on Ms. Bobb's case on October 20, 2017. The Special Master's report summarized Ms. Bobb's testimony as follows (citations to the record omitted):

> At the time of the derailment, Sheryl Bobb was living at 107 Sunny Oak Trail, Carencro, Louisiana with her adult son, Martin Bobb Jr., and five-year-old daughter, Alyiah Bobb. At the time of the derailment, she and her daughter were at a family gathering at her mother's house at 475 Berry Road in Lawtell. . . . She heard a loud noise when the derailment occurred. She testified that she smelled something as well, but that she did not notice the smell right away. She was informed by some residents who live near her mother's house that a derailment had occurred. She did not evacuate from her mother's house but instead stayed there overnight with her minor daughter as she typically stayed there when she had work the next day so that she could spend quality time with her daughter. The only physical symptoms she suffered were watery and red eyes for a couple of hours. She used Visine and Benadryl to treat this. . . .
>
> Ms. Bobb testified that her daughter, Alyiah Bobb, complained of irritated eyes and burning or itchy throat as a result of the derailment. She gave Alyiah Visine and Benadryl to treat this. She testified that her daughter did not have any fear or fright.
>
> On cross-examination, Ms. Bobb testified that she never brought her daughter, Alyiah, to a doctor for her physical complaints.

---

[2] The appointment of a special master may be made "[p]ursuant to the inherent judicial power of the court and upon its own motion and with the consent of all parties litigant[.]" La.R.S. 13:4165(A). In such capacity, the special master "has and shall exercise the power to regulate all proceedings before him and to do all acts and take all measures necessary or proper for the efficient performance of his duties." La.R.S. 13:4165(B). Such duties may include making "findings of fact or conclusions of law[.]" La. R.S. 13:4165(C)(1).

Ms. Bobb testified that she also never treated with a physician for her physical complaints. . . .

Specifically, Ms. Bobb testified regarding her damages:

Q. Did you suffer any inconvenience as a result of the derailment?

A. As far as, like, loss of work you're trying to - - if that's what you're asking?

Q. Any inconvenience?

A. No, I would say.

Q. Did you suffer any fear and fright as a result of the derailment?

A. Well, we had a couple - - well, as a child, we had something that happened in that incident with the railroad track. One of the priests that was well-known had got hit; he was crossing the railroad track. I mean, it just brings back memories sometimes when something occurs at that railroad track.

. . . .

Q. Did you incur any expenses as a result of the train derailment?

A. Uh-uh.

The Special Master concluded that Ms. Bobb's testimony was credible, but "that the only damages the plaintiffs, Sheryl Bobb and Alyiah Bobb, suffered as a result of the derailment and chemical spill were physical damages." The Special Master determined that they did not meet their burden of proof "as to any mental anguish damages or any inconvenience damages." Therefore, the Special Master recommended that each be awarded $100.00 in pain and suffering. Union Pacific objected to the recommendation.

After a hearing on July 27, 2018, regarding Union Pacific's objection to the Special Master's recommendation, the trial court affirmed the Special Master's recommendation in favor of Ms. Bobb individually, and on behalf of Alyiah Bobb, according to La.R.S. 13:4165C(3); awarded $200.00 plus judicial interest from the

3

date the Petition was filed, July 11, 2014, until paid; and cast all costs, including the Special Master's fees, against Union Pacific. The trial court awarded Plaintiffs a lump sum in the amount of $200.00, without designating the award as compensation for pain and suffering. The trial court's judgment was signed September 6, 2018, and was designated as final and immediately appealable.

On appeal, Union Pacific assigns one assignment of error: the trial court erred in awarding damages to Plaintiffs for physical injuries, absent any evidence showing that the alleged damages were caused by the Lawtell Derailment or exposure to chemicals released during the Lawtell Derailment.

**STANDARD OF REVIEW:**

In this case, the trial judge sat as the trier of fact.[3] On appeal, factual findings are not set aside absent manifest error or unless the trial court was clearly wrong. *Stobart v. State, Dep't of Transp. and Dev.*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). To reverse a trial court's factual findings, the appellate court must apply a two-tiered test when reviewing the facts and must find that (1) the record does not establish a reasonable factual basis for the finding of the trial court, and (2) "the record establishes that the finding of the trial court is clearly wrong (manifestly erroneous)." *Bradford v. CITGO Petroleum Corp.*, 17-296, p. 4 (La.App. 3 Cir. 1/10/18), 237 So.3d 648, 658-59, *writ denied*, 18-272 (La. 5/11/18), 241 So.3d 314. However, "[i]f the trial court's findings are

---

[3] Although under the authority of La.R.S. 13:4165 the district court empowered the Special Master to make findings of fact and conclusions of law, the Louisiana constitution and laws vest the judicial power in judges to make the final determinations of fact and conclusions of law. *See Bordelon v. La. Dep't of Corrections*, 398 So.2d 1103 (La.1981). In conformity with that mandate, La.R.S. 13:4165(C)(3) provides, in pertinent part, "After a contradictory hearing, the court may adopt the report, modify it, reject it in whole or in part, receive further evidence, or recommit it with instructions." In the present case, the trial court affirmed the Special Master's findings of fact and conclusions of law. Thus, the trial judge functioned as the ultimate factfinder and adjudicator of the law in this case.

reasonable in light of the record reviewed in its entirety, the appellate court may not reverse." *Arabie v. CITGO Petroleum Corp.*, 10-2605, p. 19 (La. 3/13/12), 89 So.3d 307, 312. Thus, "when there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous." *Id.* This court must be cautious not to reweigh the evidence or to substitute its own factual findings just because it would have decided the case differently. *See generally Housely v. Cerise*, 579 So.2d 973 (La.1991).

**DISCUSSION:**

Before addressing the merits of Union Pacific's assignment of error, it is worth noting that a lump sum judgment of damages, as we have in this case, "is presumed to award all items of damages claimed, and the appellant's burden of proving the fact finder clearly abused its great discretion is more difficult than usual because the intention to award a specific amount for any particular item is not readily ascertainable." *Boutte v. Nissan Motor Corp.*, 94-1470, p. 12 (La.App. 3 Cir. 9/13/95), 663 So.2d 154, 161.

In this case, Plaintiffs' petition requests the following damages: costs of medical treatment; past, present, and future lost wages; past, present, and future mental anguish; loss of enjoyment of life; inconvenience; nuisance; medical monitoring expenses; contamination to property; trespass; and "[o]ther damages which will be shown at the trial of this matter."

Therefore, *Boutte* would suggest that we would have to find that the trial court abused its discretion in awarding Ms. Bobb $200.00 in total for her and Alyiah Bobb's general damages in order to reverse. Nonetheless, because the lump sum of $200.00 awarded for damages is the full amount that the Special Master recommended on behalf of Plaintiffs, we assume that the trial court adopted

5

the Special Master's recommended award to compensate specifically for pain and suffering.

Union Pacific's sole assignment of error argues that the trial court erred in making the factual determination that Plaintiffs suffered physical injuries as a result of the train derailment.[4] Union Pacific asserts that Plaintiffs failed to present any expert evidence to establish general or specific causation. In fact, Union Pacific argues that there is no proof regarding whether exposure to these chemicals was even possible in Plaintiffs' circumstances because the chemicals were released in liquid form and there is no evidence Plaintiffs were in the vicinity of that liquid. Additionally, there is no evidence of another pathway of exposure by which Plaintiffs might have been injured. Union Pacific asserts that temporal proximity of symptoms alone is insufficient to prove causation.

Plaintiffs counter that the Material Data Safety Sheets ("MSDS") for the chemicals contained in the train cars were admitted and that there was testimony regarding the MSDS. Plaintiffs argue that the harms dictated in the MSDS are consistent with their symptoms.

In *Arabie*, 89 So.3d at 321, the supreme court explained that "[t]he test for determining the causal relationship between the tortious conduct and subsequent injuries is whether the plaintiff proved through medical testimony that it was more

---

[4] After a review of the record, we note that the petition filed on behalf of all plaintiffs does not allege damages for pain and suffering—only for medical expenses, which Plaintiffs have none. However, the petition requests "[o]ther damages which will be shown at the trial of this matter." Therefore, we find Plaintiffs' petition inclusive of pain and suffering damages. Additionally, under La.Code Civ.P. art. 862, relief is granted to "the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general and equitable relief." In fact, Defendants did not and do not object to the pain and suffering award for the reason that it was not pled; they rely only on the argument that Plaintiff failed to prove causation. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. . . . failure to so amend does not affect the result of the trial of these issues." La.Code Civ.P. art. 1154.

6

probable than not that the subsequent injuries were caused by the accident." In *Bradford*, 237 So.3d at 659 (citations omitted), the third circuit noted that "[p]roof of causation in toxic tort cases has two components, general and specific. 'General causation' refers to whether a substance is capable of causing a particular injury or condition in the general population, while 'specific causation' refers to whether a substance caused a particular individual's injury." Further, "cases only establish that expert testimony on causation is required." *Id*.

The Special Master provided the following pertinent Findings of Fact:

1. A train derailment occurred on August 4, 2013 between the time of 3:20pm and 3:30pm in Lawtell, Louisiana.

2. This derailment involved a train and tracks owned, operated and maintained by the defendant, Union Pacific Railroad Company.

. . . .

5. As a result of this derailment, chemicals were spilled (including lube oil, dodecanol and sodium hydroxide) from some of the derailed train cars.

6. The derailment and its resulting chemical spill and the threat of the spill was the cause of an evacuation order being issued for the residents located within an approximate one mile radius of the derailment with the center of the radius being the derailment site and thus potentially extending that distance from either end of the derailment.

. . . .

8. After the derailment, many of the residents in areas near the derailment developed varying complaints of physical symptoms lasting for varying time periods.

Additionally, the Special Master found, and the record shows, that although air monitoring was conducted, it was not done immediately following the derailment. In fact, state police could not immediately go on the scene of the derailment due to a rain event that occurred shortly after the derailment, which

hindered the response. The Center for Toxicology and Environmental Health (CTEH), hired by Union Pacific to primarily conduct air monitoring, did not have any air monitor readings before 8 p.m. on the night of the derailment. Further, the rain event caused "wind shifts and water to affect the spilled chemicals and led to their disbursement into the surrounding area and waterways." The rain event, as well as discharge of water by farmers, permitted chemicals to enter the drainage system and Bayou Mallet and travel approximately seven miles, which resulted in the chemicals entering the property of many adjacent landowners. However, members of the response and clean-up crew testified that they did not have any symptoms when they were at the derailment site.

Specifically, as to Plaintiffs, the Special Master found and the record supports:

19. At the time of the derailment, Sheryl Bobb and Alyiah Bobb were at a family gathering at Sheryl's mother's house in Lawtell, Louisiana.

20. Neither Sheryl Bobb nor Alyiah Bobb witnessed the derailment.

21. Sheryl Bobb complained of physical symptoms (watery and red eyes lasting a couple of hours) on the day of the derailment.

22. Alyiah Bobb complained of physical symptoms (irritated eyes and burning/itchy throat) on the day of the derailment.

The MSDS for lube oil, dodecanol, and sodium hydroxide solution were admitted into evidence, and Mr. Christopher Calvitt, an Environmental Scientist II and lead investigator for the Louisiana Department of Environmental Quality for this derailment, read the MSDS information as his testimony. Mr. Calvitt testified regarding the MSDS for dodecanol as follows:

Says some of the potential health effects of exposure to the eyes would be irritating to the eyes, may cause corneal inflammation, swelling of the eyes. Skin, prolonged skin contact may cause skin

8

irritation or dermatitis. High standards of skin care and personal hygiene should be exercised at all times. Inhalation, states the irritation of nose and throat, dizziness and headache would be possible. As far as ingestion, ingestion of material would cause central nervous system depression. Ingestion may cause gastrointestinal irritation, nausea, vomiting, diarrhea. And aspiration hazard, if swallowed, can enter lungs and cause damages.

He further testified the MSDS for sulfidic caustic solution (or "sodium hydroxide solution") provides as follows:

It states the potential health effects for eye contact will cause marked eye irritation, possible severe corneal damage. Health effects to skin contact would be contact with skin will cause skin irritation or burning sensation. Prolonged contact will result in corrosion of the skin. States skin absorption is unlikely to occur. Ingestion will result in severe burning, corrosion of mouth, throat, gastrointestinal tract. If the ingested material contacts stomach acid, highly toxic hydrogen sulfide will be evolved. It also states inhalation, product solution and vapors contain some highly toxic hydrogen sulfide gas. Exposure to this gas causes headaches, nausea, dizziness and vomiting. Continued exposure can lead to loss of consciousness and death.

Lastly, for lube oil, Mr. Calvitt testified that the MSDS provided:

It states depending on routes of exposure, possibly inhalation, ingestion, skin or eye contact. Of those, eyes may cause slight transient irritation, lacrimation or tears and a burning sensation in the eyes. It also states that skin may have slight - - due to exposure, may have slight irritation. Repeated and prolonged skin contact may cause reddening, itching or inflammation. Inhalation may cause - - under normal circumstances - - conditions, inhalation is not expected to be a problem. However, respiratory tract irritation may occur if exposed to fumes or mists. May cause central nervous system depression or effects. . . .

Mr. Calvitt further testified that MSDS are reviewed in situations such as this train derailment and subsequent chemical spill as a "tool to try to either identify, monitor or protect ourselves against that chemical." However, Mr. Calvitt was not an expert in this case and, therefore, could not provide any expert opinions regarding the chemicals. Mr. Calvitt further testified that he and his team only tested for certain chemicals based on what they were told had been released. Mr.

Calvitt personally donned protective eyewear which protects from particulate matter, although he did not test for particulate matter.

Dr. Kelly Scribner with CTEH, testified that while no vinyl chloride was detected before its transfer into another carrier, they did find "instances of low level volatile organic compounds detected periodically throughout these documents, but none above action levels that were established for the work area or for the community." Dr. Scribner also testified that she did not specifically test for dodecanol.

Dr. Scribner also testified regarding the use of MSDS:

Q.    . . . So, isn't one of the purposes of MSDS to know how people - - I know it's for the industry - - but as in people, when they come in contact with these substances, what to expect?

A.    No.  They give you the potential of what could happen depending on the scenario.  It's not an indicator of expectation, but an indicator of potential.

Q.    So, it's what could happen?

A.    Yes, right.

Q.    So, what you would have to do to find out if it happened is you have to go out, and you would have to get real world evidence; is that correct?

A.    If I understand what you are saying, partially, yes.

Q.    So, you get the evidence is the smell.  MSDS says, if there is such and such release, you might smell a certain thing.  So, if that smell is consistent with what you would expect, then that would be evidence that there was that release; wouldn't it be?

A.    No, not necessarily.

Q.    That's not - - I'm not asking you if it is dispositive of the question.  I'm asking you if that would be evidence.  Would that be something that you would have to investigate?

A.    It's something you would investigate, yes.

Despite the fact that the MSDS and the Hazardous Material Response Information sheets were admitted into evidence and that evidence indicates eye burning as a potential result of the spilled chemicals, Plaintiffs did not submit any expert evidence in support of causation, general or specific.

Although Plaintiffs cite *Broussard v. Multi-Chem Group, LLC*, 17-985 (La.App. 3 Cir. 7/11/18), 255 So.3d 661, *writ denied*, 18-1347 (La. 11/14/18), 256 So.3d 258, in support of the finding of causation in this case, the plaintiffs in *Broussard* provided multiple experts who testified that the smoke plume from the explosion travelled in the areas in which the plaintiffs were and that particulate matter existed for days in the air sampling data. Expert testimony regarding the risk posed by the fire's emissions was also submitted, as well as testimony of a medical doctor who explained that the type of injuries reported by the various plaintiffs more likely than not resulted from exposure to particulate matter and chemicals from the explosion.

Further, in *Arceneaux v. CITGO Petroleum Corp.*, 18-370 (La.App. 3 Cir. 1/9/19), 263 So.3d 1251, *writ denied*, 19-228 (La. 4/8/19), 267 So.3d 615, although one plaintiff, Mr. Richard, did not receive medical care, expert testimony was still provided to relate Mr. Richard's symptomology to chemical exposure, in addition to the fact that his symptoms were contemporaneous with his alleged exposure, similar to those indicated on the MSDS introduced into evidence, and similar to those symptoms experienced by other plaintiffs.

In the current case, there were no experts presented to testify on causation. Instead, Plaintiffs relied on the MSDS and the contemporaneous onset of their symptoms. Therefore, without expert testimony to relate Plaintiffs' symptoms to any particular exposure, we find that the trial court was manifestly erroneous in

11

awarding damages for pain and suffering in this case and reverse the general damage award.

**CONCLUSION:**

After a review of the record, we find that the trial court erred in awarding general damages for pain and suffering, based on its adoption of the Special Master's report, and reverse that award. Costs of this appeal are assessed to Plaintiffs, Sheryl Bobb individually and on behalf of Alyiah Bobb.

**REVERSED.**