WICKER, J.
|, This appeal arises out of a judgment of the district court dismissing plaintiffs’ personal injury claims against the City of Kenner (“Kenner”) with prejudice. Plaintiffs—Lorrie Sandifer, Pamela Johnson, *309 Sharon Ogden, Vanessa Davis,- and Mar-vine Shedrick[1]—were passengers on a miniature amusement park train when it derailed and flipped, allegedly causing plaintiffs’ injuries. In two separate actions which were later consolidated, plaintiffs petitioned for damages against (1) park and track owner Kenner, (2) miniature train owner and operator R & R Train Company, Inc., (3) Richard T. Jacobs, who owned R & R Train Company, Inc., and (4) Fernand Webber, the individual who operated the train ride at the time of the accident. After the district court dismissed Richard T. Jacobs from the action and a Chapter 7 bankruptcy automatically stayed the action with respect to R & R Train Company, the district court conducted a bench trial.[2] Thereafter, the court entered a judgment in favor of Kenner. The district court later granted plaintiffs’ motion for new trial to consider additional evidence related to the theory of res ipsa loquitur. After considering the testimony of plaintiffs’ expert in miniature train operation, maintenance, and derailment, the district court dismissed plaintiffs’ claims against Kenner with prejudice. Because we find no error in the district court’s conclusion that plaintiffs failed to meet their burden to prove Kenner’s negligence caused their alleged injuries, we affirm the district court’s judgment.
FACTUAL AND PROCEDURAL BACKGROUND
Oh May 12, 2006, Jefferson Parish’s Head Start Program held a field trip for students and teachers at Veterans Park on Williams Boulevard in Kenner, Louisiana. To add to the festivities, R & R Train Company, Inc., which owned and ^operated a miniature train ride at the park, donated free rides for the children and their chaperones. At around 1 p.m., plaintiffs—all of whom were chaperones working for Jefferson Parish Head Start— along with two other adults and one child boarded the train for the last ride of the day. As the train approached the first curve of the tracks, the train operator, Fernand Webber, “felt some jiggling.” When he glanced over his shoulder, he saw one of the cars starting to tip over. He immediately applied the brakes and “killed” the throttle to the engine in order to stop the train. By the time the train had stopped, both cars had tipped over, thrusting passengers into a fence which bordered the tracks. The train’s locomotive, however, remained on the tracks.
On April 27, 2007, plaintiffs Lorrie San-difer, Pamela Johnson, Sharon Ogden, and Vanessa Davis (the “Sandifer plaintiffs”) filed a petition for damages in Case No. 644-220, Twenty-Fourth Judicial District Court, Division K, against Kenner, R & R Train Company, Inc., Richard T. Jacobs, and Fernand Webber. On November 7, 2007, Jefferson Parish filed a petition for intervention, seeking reimbursement of workers’ compensation indemnity benefits and medical expenses paid to plaintiffs.[3]
On January 24, 2011, R & R Train Company, Inc., Richard T. Jacobs, and Fer-nand Webber filed a cross claim against Kenner, alleging negligent representation and failure to properly defend and arguing that they are entitled to indemnification *310 should they be found liable for any negligence.
On March 14, 2013, Richard T. Jacobs filed a peremptory exception of no cause of action. Thereafter, on April 23, 2013, the district court granted the' exception and issued a judgment dismissing all claims against Richard T. Jacobs with prejudice.
laOn Kenner’s motion and with the consent of all parties, the district court issued an order on June 14, 2013, consolidating the Sandifer case with Shedrick, et al. v. City of Kenner, et al., No. 644-777, Twenty-Fourth Judicial District Court, Division. Marvine Shedrick was also a train passenger at the time of the accident. Her husband, LC Shedrick, alleged loss of consortium,
Plaintiffs’ .claims against R & R Train Company, Inc., were automatically stayed on February 21, 2014, when the company filed for Chapter 7 bankruptcy.

The First Bench Trial

On May 30, 2015, the district court conducted a bench trial. Each of the' five plaintiff-passengers testified that she faced forward during the train ride, that she did not move in a manner that would- cause the train to flip over, and that she did not see any other passenger move in a manner that would cause the train to flip. Indeed, plaintiff Marvine Shedrick testified that, although she sat in the last seat on the train and could see everyone in front of her, she did not stand or jostle the train and did not remember seeing any other passenger stand or jostle the train in any way. Moreover, she denied seeing anyone leaning on the side of the train at any time. ,
Although all of the plaintiffs denied seeing any rotten or loose “rail ties” (alternatively, referred to as “cross ties”)—that is, pieces of wood to which the track is affixed for the purpose of maintaining the proper distance between the two rails—plaintiffs’ counsel heavily emphasized two “Amusement Ride Safety Inspection Report[s]” issued by the Louisiana Office of the State Fire Marshal, one issued six months before the accident and the other issued several weeks after the accident. The first report, dated December 6, 2005, and signed by inspector Ruven St. Pierre, indicated that “some rail ties are loose and rotten” and ordered for those rail ties to be replaced within 30 days. The second report, issued on May 30, 2006, ordered, among other things, that “all wood cross ties” be replaced “prior to [ ¿operation.” This report was signed by inspector Claude Ray. The parties stipulated to the admission of both reports into evidence.
Plaintiffs also offered and the district court admitted into evidence the deposition testimony of Richard T. Jacobs, the owner of R & R Train Company, who was deemed unavailable after plaintiffs made diligent, efforts to subpoena him.[4] At his deposition, Mr. Jacobs testified that it was Kenner’s responsibility to make repairs to the track, that he notified Kenner of the State Fire Marshall’s December 6, 2005 report ordering the replacement of “some” loose and rotten cross ties, and that Ken-ner did not make the requested repairs. Although Mr. Jacobs did not witness the accident, Mr. Jacobs acknowledged three possible causes of the train derailment: (1) excessive speed, (2) a shift in passenger weight at the curve in the tracks, or (3) a track failure. During his deposition, Mr. Jacobs seemed to indicate that a track *311 failure could occur without leaving any visual traces:
Q. Okay. Let’s talk very quickly about the rail ties. What is the function of a rail tie?
A. The cross tie is to hold the track in gauge and to support the weight of the train while it’s moving down the track.
Q. Okay. If a rail tie fails, the track can shift right?
A, Yes, to some degree. But you’re going to have to have more than one rail tie failure.
Q. Fair enough. If you have multiple rail tie failures—
A. Yeah.
Q,—if I understand correctly, the track can pop up and right back down?
IfiA. Yeah.
Q. And visually—
A. You’ll never—
Q, —it will look like nothing ever happened, right?
A. Visual inspection, you’ll never be able to tell that the trail [sic]—that the track rolled or popped.
Mr. Jacobs testified that he did a visual inspection of the track following-the accident and did not see .any loose or rotten cross ties in the area of the accident.
In its case-in-chief, Kenner called Fer-nand Webber, who operated the train at the time of the accident and who was .named as a defendant in plaintiffs’ petition. Mr. Webber testified that. Mr, Jacobs trained, him to “look at the cross ties, look for bolts or fasteners that might be missing, or something that would have been out of place to create obstructing [sic] the track.” Mr. Webber recalled that, on the day of the accident, he arrived approximately two to three hours before he began running the train. As part of standard procedure, after “walking] the tracks down both sides, looking at each rail individually,” he proceeded to the train barn “to check the locomotive and cars, fuel it, and run .it around the track a couple of times [by himself as a] secondary inspection.” He did not- identify any problems with the train or with the tracks, Mr. Webber explained that the purpose of this procedure was to “make sure there wouldn’t be a problem”: “If the tracks had been misaligned or whatever, the train more than likely would have come off at the time of the maintenance run.” When questioned whether he saw any rotten cross ties on the track that day, Mr. Web-ber testified that he did not recall seeing any rotten cross ties and that he explicitly remembered inspecting around the curve where the accident later occurred without noticing any defects with the track. The “Daily Inspection” log for May 12, 2006, bearing Mr."-Webber’s initials, indicated that-Mr. |flWebber inspected the track, the "station, the cross ties, the brakes, the oil, and the fuel, and that- he removed any trash from the cars.
Mr. Webber testified that, after conducting his inspection, he began giving rides. Before the last ride of the day, he allowed the passengers to board at the. train station, told them to keep their arms and legs inside the cars, and to stay seated at all times.. At the time of the accident, he was driving the train no faster than five miles per hour, a speed which was neither faster nor slower than he had driven the train during every other ride that day. According to Mr. Webber, immediately prior to the accident, he felt “a jiggle characteristic .to somebody moving on the train”: “It felt. similar in nature to somebody shifting around in the back of the cars.” When he glanced over his shoulder to ascertain what had happened,- he “saw that'one car was starting to tip.” By the time he was able to stop the train, “both cars had gone over.” Although Mr. Webber admitted that *312 he never actually saw a passenger moving prior to the accident, he testified that the movement he felt “was characteristic of every other time somebody would move in the seat” and that he had experienced similar movement earlier in the day when a passenger was misbehaving on a previous ride.[5]
Kenner also elicited testimony from, among others, Ruven St. Pierre, who conducted the December 6, 2005 inspection on behalf of the State Fire Marshal and who inspected the tracks immediately after the accident. Mr. St. Pierre testified that his December 6, 2005 inspection was “an annual inspection for safety.” That inspection involved meeting with train owner, Richard Jacobs, checking the train’s maintenance records, inspecting the train itself, walking around the track, and riding on the train around the track. Mr. St. Pierre testified that the train and the track passed his inspection. Although he noted on his report 17that there were “some loose or rotten cross ties... scattered along the track...in certain areas,” Mr. St. Pierre explained that “it wasn’t bad enough that I had to shut it down.” Mr. St. Pierre attested that he would have issued a cease and desist order if he thought that the condition of the tracks was unsafe. Mr. St. Pierre also testified that he measured the gauge of the track as part of his inspection and that he did not note any problems with it.
Mr. St. Pierre testified that, on May 12, 2006, he received a call notifying him of the train accident. When he arrived at the scene, he “started taking pictures and then doing measurements and talking to some of the people, some of the witnesses they had there and to find out what happened.” When Mr. St. Pierre inspected the tracks in the area of the accident, he concluded, “They were normal. I didn’t see nothing wrong.” Mr. St. Pierre specifically testified that, although he observed some loose or rotten cross ties “on the other side of the park,” he did not observe any rotten or loose cross ties in the area of the accident. Mr. St. Pierre also measured the gauge of the train tracks and determined that “it was within limits.” Although Mr. St. Pierre did not accompany Claude Ray when Mr. Ray inspected the train and the tracks about two weeks later, on May 30, 2006, and ordered that “all wood cross ties” be replaced prior to operation, Mr. St. Pierre testified unequivocally that there were no rotten or loose cross ties in the area of the accident and that Mr. Ray’s report only ordered the replacement of all cross ties. Mr. Ray did not comment directly on the condition of the track or the cause of the accident.
Richard Chauvin, a safety inspector for the City of Kenner, also testified that, about two weeks after the accident, he accompanied Mr. Jacobs and the State Fire Marshal on the State Fire Marshal’s inspection of the train and the tracks.[6] |8Mr. Chauvin prepared his own report following this inspection, and the district court admitted this report into evidence. The report concluded, as follows:
The State Fire Marshalls [sic] inspected the site where the train incident occurred and concluded that the tracks were in good condition and could not find any defects in the track that would have contributed to the train incident.
*313 [[Image here]]
As stated above, the State Fire Mar-shalls [sic] did not find any defects with the train cars or the railroad tracks that would have contributed to the incident, and the only factor to the incident was the weight of the passengers.
Mr. Chauvin testified that the report reflects the information he received from the Fire Marshal at the time of the inspection and that the Fire Marshal did not indicate to him that all of the cross ties would have to be replaced. According to Mr. Chauvin, Kenner never performed maintenance on the track because that responsibility belonged to Mr. Jacobs.
After taking the matter under advisement, the district court- issued a judgment in favor of Kenner on May 6, 2015. The district court contemporaneously issued lengthy reasons for judgment. The court found that plaintiffs proved- that “Kenner owned and was responsible for maintenance of the tracks and that Kenner knew or should have known of defects in the tracks prior to operation but failed to repair the defects.” In support, the court determined it was undisputed that Kenner owned the tracks and pointed to Mr. Jacobs’ deposition testimony that it was Kenner’s responsibility to maintain the tracks, which was consistent with testimony elicited from State Fire Marshal inspector Ruven St. Pierre. The district court also highlighted Mr. Jacobs’ testimony that he informed Kenner of the State Fire Marshal’s December 6, 2005 order requiring the replacement of “some” loose and rotten cross ties in an unspecified location on the track and that Kenner did not repair the cross ties, as also evidenced by Mr. Chauvin’s testimony that Kenner never performed maintenance on the track.
|9Nevertheless, the district court found that plaintiffs’ failed to prove that the defect alleged—the presence of loose and/or rotten cross ties—caused plaintiffs’ injuries. Although plaintiffs argued that the doctrine of res ipsa loquitur applies because train derailment does not ordinarily occur in the absence of negligence, the court found that plaintiffs failed to sufficiently eliminate other more probable causes of injury, pointing to testimony Mr. Jacobs offered that temperature change can cause derailment. The court also emphasized that “[tjhere was no evidence offered that any rotten cross ties observed by the Fire Marshal in December 2006 [sic] and not repaired by Kenner, were in the area where the train derailed or were involved in any gauge change causing derailment.” In reaching this conclusion, the court indicated that the testimony elicited at trial eliminated the theories that someone stood up or sat on the back of a seat or that speed was the cause of the accident.[7]

Motion for New Trial

On May 13, 2015, the Sandifer plaintiffs timely filed a motion for new trial, arguing there was no factual basis for the district court’s conclusion that a temperature change caused the derailment because there was no evidence a temperature change occurred at the time of the accident.[8] Plaintiffs contended that Mr. Jacobs *314 offered three possible reasons in his deposition as to why the train derailed: “(1) the riders shifted in their seats, (2) the speed of the train, and (3) a defect in the tracks.” Because the court, in its reasons for judgment, found that the testimony eliminated the theories of passenger weight shift and speed, |^plaintiffs maintained .that they have sufficiently eliminated the other more probable causes of the accident and that, applying the doctrine of res ipsa loquitur, they had met their burden to prove that a track failure caused their injuries. Plaintiffs also indicated that they intended to attempt to procure Mr. Jacobs’ live testimony so the court could obtain “any clarifications with respect to the possible ways in which a train may have derailed.”
Following a hearing on June 25, 2015, the district court granted a new trial “with respect to the issue of res ipsa,’’.indicating its willingness “to take new evidence on that issue assuming [Mr. Jacobs] is available.”

The Second Trial

On June 21, 2016, the district court held a new trial at which it admitted all prior testimony and exhibits. Thereafter, plaintiffs' qualified and the district court accepted Richard Jacobs as an expert in miniature train operation, maintenance, and derailment. Acknowledging that “[t]here has to be a problem for the train to. derail,” Mr. Jacobs considered the various potential causes of the instant accident. Although excessive speed when traveling around a curve could cause derailment, Mr. Jacobs opined that he could, not discern any basis for an opinion that speed was a factor in this accident:
First thing, was the locomotive never left the track, it was on, still on the rails, had he been speeding when he entered into the curve is [sic] the locomotive would derail as well as the passenger cars, The second thing would have been, that the train would have been notably further away from the track then [sic] what it was, it basically looked like the car slipped on its side right next to the rails, which is not an indication of speeding. Usually a train is pretty heavy and when it has people in the .momentum it moves quite a distance before it finally stops. After looking at the passenger cars where they hit the ground, you. can see the scratch on the passenger car is basically running the length of the car and-if the car had slid in on its side away from the track it would have, it would have scratches in a. upward and a downward motion and not just the length of the car.
When questioned directly about plaintiffs’ theory that rotten or loose cross- ties caused the rails to pop out of gauge which then caused the train to derail, Mr, | ¶]Jacobs testified that multiple cross ties would need to fail for the rails to-dome out of gauge. Significantly, Mr, Jacobs testified that the train would have derailed at the spot where the track had come out of gauge: " "
[Y]ou’re going to feel that shift in the train, you’re going to stop to find out what happened. As far as getting pass [sic] the spot where the train had lost gauge and came back in again, I mean, you can keep driving pass [sic] it but if it’s going to derail it’s going to derail right there. It’s not going to move 10 feet down the track and then come off the track way from that spot.. .it’s pretty much going to derail right at it.
When cross-examined by Kenner’s counsel, he agreed that there would be evidence of rotten cross ties if that was the cause of the accident. Although he conducted a vi *315 sual inspection of the tracks following the accident, Mr. Jacobs never found evidence of loose or rotten cross ties in the area where the derailment occurred. He specifically recalled walking the tracks with Mr. Chauvin and the State Fire Marshal at the end of May 2006, and he did not see any evidence of rotten or loose cross ties or any other evidence that would cause him concern about the condition of the track in the area where the accident occurred. Moreover, he observed no evidence that the train derailed before it flipped over. Although a train when it derails would “tare [sic] the ground up until it stops,” Mr. Jacobs did not see any evidence of this: “I didn’t see any evidence that the train had come off the track and rolled along the cross ties into the dirt..-. .The train had obviously moved, I would say at least five or six feet before it came to a complete stop, so you would have that much damage on the ground where the wheels came off.”
Throughout his testimony, Mr. Jacobs maintained that a weight shift most likely caused the accident. On cross-examination, Kenner’s counsel asked Mr. Jacobs to consider the train passengers’ heights and weights as reflected in the police report which was admitted into evidence:
Q. And I’m not going to put their names. Their names are in the record. One woman was 5’4‘ tall and weighed 260 pounds. One was 5’6‘, 270 pounds; one 5’4‘, 190 pounds; 5’2‘, 286 pounds; 5’6‘, 225 Impounds; 5’10‘, 150 pounds; 5’3‘, 125 pounds, and then there’s a child on here and they did not give the weight of the child.... If the height and the weight of the passengers is accurately reflected in this police report, would that give you any indication as to how weight would have shifted and caused this accident?
A. ... .So I don’t know if two of them were in the front car, three of them were in the back car, vice versa, but if you put someone that large on one side of one car and their weight is all the way up against it [sic] it could cause the car, the train to flip... .You would have to be leaning over to one side of the car.
During extensive questioning by the district court, Mr. Jacobs further explained the basis of his opinion that weight shift caused the accident:
THE COURT: If you don’t mind I have a few questions. You have indicated or [plaintiffs’ counsel] asked you is [sic] there were three potential causes [sic] a weight .shift, a problem with the track, and -then speed. And you said in your opinion it was not speed. And I know there was some testimony or some questions by [Kenner’s counsel] about being too much weight on one side of the train.
Are there any other potential causes of the accident in your expert opinion?
THE WITNESS: Can I say?
THE COURT: Absolutely.
THE WITNESS: Just because a train would derail does not mean that it would flip onto its side. Something caused the train to flip onto its side. It didn’t just do it because it came off of the track. And there’s two potential ways that that can happen, and one is a weight shift on the train, and the other is speeding in the centrifugal force of going around the curve would [sic] force the train to flip over.
THE COURT: So in your expert opinion a problem with the track wouldn’t cause this type of accident.
THE WITNESS: Not necessarily.
THE COURT: It could but not necessarily?
THE WITNESS:. Nof-necessarily.
*316 THE COURT: Because you just now said there were two potential ways. So in addition to those two potential ways the problem with the track is another potential way?
THE WITNESS: Wait. I’m sorry?
[1STHE COURT: Is a problem with the track another potential way that this accident could have occurred in your expert opinion?
THE WITNESS: If the track was elevated above the ground then there’s the potential that the train could flip because there would be a place for the train to get on to it’s—off of the track and down. The track laid in this area was fairly—it was level with the ground. There wasn’t sticking up above the ground. So just again, again, just because the train derailed does not mean that it was going to flip over. There had to be something caused [sic] the train to flip and a derailment would not cause the train to flip.
THE COURT: Okay. So even if there was a problem with the track there would have had to be something else to cause it to flip?
THE WITNESS: Something caused the train to flip onto its side, yes.
THE COURT: Okay. In your expert opinion what more probably that not caused the accident?
THE WITNESS: I believe a weight shift on the train caused the accident.
During follow-up questioning by plaintiffs’ counsel, Mr. Jacobs assented to the possibility that the train could have derailed and then plaintiffs’ could have shifted their weight after the fact causing the train cars to flip.
The district court took the matter under advisement. On July 28, 2016, the district court entered judgment in favor of Ken-ner. In its contemporaneously issued reasons for judgment, the district court thoroughly summarized the testimony of Mr. Jacobs, crediting his expert opinion that weight shift on the train more probably than not was the cause of the accident. Accordingly, the court concluded that plaintiffs failed to carry their burden of proving that Kenner’s negligence in failing to repair the loose and rotten cross ties referenced in the December 6, 2005 State Fire Marshal Report was the cause of the accident.
Because the judgment issued on July 28, 2016, did not include decretal language necessary to make it a final appealable judgment, on February 6, 2017, we exercised our supervisory jurisdiction and remanded for the district court to amend its judgment. On February 8, 2017, the district court issued an amended | ^judgment dismissing the claims of plaintiffs Lori Sandifer, Pamela Johnson, Sharon Ogden, and Vanessa Davis with prejudice. On March 9, 2017, the district court amended its judgment once again to include the claims of Marvine and LC Shedrick among those dismissed with prejudice.
Both the Sandifer plaintiffs and the She-drick plaintiffs devolutively appeal from this judgment.
DISCUSSION
The Sandifer plaintiffs allege two assignments of error. First, the Sandifer plaintiffs argue the district court committed manifest error when it did not apply the doctrine of res ipsa loquitur “when there was no direct evidence of the cause of the miniature train derailment.” Second, they contend that the district court committed manifest error “when it did not find that the City of Kenner’s negligence more probably than not caused the miniature train derailment when the evidence demonstrated that (1) the train tracks were defective, (2) Kenner was responsible for maintaining the tracks and failed to do so, *317 despite being on notice, (3) defective train tracks can cause gauge changes that lead to derailments, and (4) no other potential causes of the accident were supported by evidence at trial.”
The Shedrick plaintiffs raise four assignments of error. First, they argue the district court improperly applied an elevated burden of proof when it required plaintiffs to disprove another “possible” cause of the accident. Second, the Shedrick plaintiffs allege the district court committed manifest error in finding that the accident may have been caused by a temperature change affecting the gauge of the tracks as there was no evidence in the record to support this finding. Third, the Shedrick plaintiffs contend that the district court committed manifest error when it did not apply the doctrine of res ipsa loquitur to find Ken-ner liable for plaintiffs’ injuries as the “overwhelming and uncontroverted circumstantial evidence” demands the finding that Kenner’s failure to maintain the tracks more probably |1fithan not caused the accident. Fourth, they allege the district court erred in failing to award damages for injuries they sustained as a result of the accident.
Kenner answered plaintiffs’ consolidated appeal, providing several alternative additional reasons to support the district court’s judgment in favor of Kenner. First, Kenner argues the district court erred in applying the doctrine of res ipsa loquitur where direct evidence proved the tracks were not loose or rotten at the site of the incident. Second, it maintains the district court erred in failing to grant Kenner statutory immunity under La. R.S. 9:2795. Third, Kenner contends the district court erred in failing to recognize that Kenner is entitled to the limitations of liability afforded to political subdivisions under La. R.S. 13:5106. Finally, Kenner argues that the district court erred in finding that the train tracks and train constituted an amusement ride and not playground equipment. Our decision to affirm the district court’s judgment pretermits further consideration of these arguments.

Res Ipsa Loquitur

The Sandifer plaintiffs’ Assignments of Error 1 and 2 and the Shedrick plaintiffs’ Assignments of Error 1 and 3 implicate the doctrine of res ipsa loquitur, as plaintiffs allege the district court misapplied this doctrine and committed manifest error when it refused to apply it to find Kenner liable for their injuries. We disagree.
It is well-settled that a reviewing court may not disturb the factual findings of the trier of fact in the absence of manifest error. Arabie v. CITGO Petroleum Corp., 10-2605 (La. 3/13/12), 89 So.3d 307, 312; Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La. 1978). In Arceneaux, the Louisiana Supreme Court set forth a two-part test for the appellate review of facts: (1) the appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court, and (2) the appellate court must further determine that the record establishes the finding is not clearly wrong or manifestly erroneous. Arceneaux, 365 So.2d at 1333; Arabie, 89 So.3d at 312. If the trial court’s findings are reasonable and not clearly wrong in light of the record reviewed in its entirety, the appellate court may not reverse. Arabie, 89 So.3d at 312; Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La. 1990). Consequently, when there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous. Arabie, 89 So.3d at 312; Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 883 (La. 1993).
*318 Plaintiffs bore the burden of proving .that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached. Cormier v. T.H.E. Ins. Co., 98-2208 (La. 9/8/99), 745 So.2d 1, 7. As an initial matter, we find no manifest error in the district court’s well supported conclusion that plaintiffs did not carry their burden of proving that Kenner’s failure to maintain the tracks was the cause of their injuries. There is ample support in the record—including the trial testimony of Fernand Webber, Ruven St. Pierre, and Richard Jacobs, all of whom inspected the area of the accident and denied seeing any rotten or loose cross ties—for the district court’s conclusion that there were no defective cross ties in the area of the accident. Moreover, Mr. Jacobs’ expert testimony that there would be evidence of loose or rotten cross ties in this area if track failure was the cause of the accident provided a reasonable factual basis for the court’s conclusion that track failure was riot the cause of plaintiffs’ injuries.
After granting plaintiffs’ motion for new trial and considering the testimony of Mr. Jacobs at that new trial, the district court determined that the doctrine of res ipsa loquitur did not require the conclusion that Kenner’s negligence was the cause |17of plaintiffs’ injuries. Res ipsa lo-quitur is a rule of circumstantial evidence which allows an inference of negligence on the part of the defendant if the facts indicate the defendant’s negligence, more probably than not, caused the injury. Linnear v. CenterPoint Energy Entex/Reliant Energy, 06-3030 (La. 9/5/07), 966 So.2d 36, 45. It applies in cases involving circumstantial evidence, rather than direct evidence, provided the plaintiff establishes the following foundation of facts: (1) the injury is of the kind which does not ordinarily occur in the absence of negligence; (2) the evidence sufficiently eliminates other possible causes of the injury, such as the plaintiffs own responsibility or the responsibility of others; and (3) the alleged negligence of the defendant must fall within the scope of his duty to the plaintiff, which will often be the case if the defendant had exclusive control of the thing or situation that caused the injury to the plaintiff. Id, Application of the res ipsa doctrine is not appropriate where specific acts of negligence are alleged and direct evidence is available to explain a reason for plaintiffs damages or the defendants’ actions. Valence v. Jefferson Parish Hosp. Dist. No. 2, 13-48 (La.App. 5 Cir. 10/30/13), 128 So.3d 455, 461. Further, application of the res ipsa doctrine does not relieve the plaintiff of the ultimate burden of proving by a preponderance of the evidence all of the elements necessary for recovery. Id.
In the present case, plaintiffs alleged Kenner committed specific acts of negligence, i.e., failure to maintain the train tracks. Leaving aside the repeated testimony that inspectors did not find defective cross ties in the area of the accident and the expert testimony that such evidence would have been present if a track failure had occurred, the testimony of plaintiffs’ own expert effectively foreclosed track failure as a possible cause of the accident when he testified that only excessive speed or a weight shift,would have caused the train to flip over. Although Mr. Jacobs seemed to lend some credence to plaintiffs’ counsel’s theory that it is possible a weight, shift could have occurred causing the train car. to flip | wdfter a track failure caused the train to derail, Mr. Jacobs clearly testified there was no evidence the train derailed before it flipped over. Thus, we find that plain *319 tiffs’ expert’s testimony foreclosed plaintiffs’ theory of causation. Because the doctrine of res ipsa does not relieve plaintiffs of their ultimate burden, we find no error in the district court’s conclusion that plaintiffs failed to prove a track failure was more probably than not the cause of the accident.
Accordingly, we find these assignments of error to be meritless.

Temperature Change

The Shedrick plaintiffs allege the district court committed manifest error in finding that the accident may have been caused by a temperature change affecting the.gauge of the track as there was no evidence in the record to support this finding. We disagree as the district court did not ground its July 28, 2016 judgment on this factual finding—a statement taken from the deposition testimony of plaintiffs’ expert—but on plaintiffs’ failure to prove track failure was the cause of plaintiffs’ injuries.

Damages

Finally, the Shedrick plaintiffs urge that the district court erred when it failed to award damages. Because we find no error in the district court’s conclusion that plaintiffs did not carry their burden to prove all of the elements of negligence, we find this assignment of error is meritless.
DECREE
Accordingly, for the foregoing reasons, we affirm the district court’s judgment dismissing all of plaintiffs’ claims against Kenner.
AFFIRMED

. Marvine Shedrick's husband, LC Shedrick, also alleged loss of consortium.

. The record does not disclose whether plaintiffs have continued to pursue their claims against Mr. Webber, who testified at the bench trial.

. At trial, the parties stipulated to Jefferson Parish’s workers’ compensation lien and to the total amount paid by Jefferson Parish for plaintiffs’ workers’ compensation claims.

. Although it is not clear when plaintiffs offered and the district court accepted Mr. Jacobs as an expert during the first bench trial, the district court notes in its May 6, 2015 reasons for judgment that "Epllaintiffs offered Jacobs as an expert in train'derailment based on twenty-five (25) years experience with trains.”

. The record also contains the results of a breathalyzer test to which Mr. Webber submitted on the day of the accident. The test indicates Mr. Webber's blood alcohol level was ,000%.

. Although Mr. St. Pierre testified that he was not present during this inspection, Mr. Chau-vin testified that Mr. St. Pierre was present along with another State Fire Marshal inspector.

. The district court also determined that Ken-ner is not immune from liability pursuant to the Recreational Immunity Statute, La. R.S. 9:2795. In answering plaintiffs’ appeal, Ken-ner avers, among other things, that the district court erred when it found La. R.S. 9:2795 does not apply to grant it recreational use immunity. Our decision to affirm the district court’s judgment on other grounds pre-termits consideration of this argument.

. It was not necessary for the Shedrick plaintiffs to file a separate motion for new trial. Pursuant to La. C.C.P. art. 1971, “A new trial may be granted, upon contradictory motion of any party or by the court on its own motion, *314 to all or any of the parties and on all or part of the issues, or for reargument only.''